AO 102 (01/09) Application for a Tracking Warrant  (modified by USAO for telephone or other reliable electronic means)

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Ohio

FILED

2022 SEP 30  AM 11: 34

WESTERN DIV DAYTON

| In the Matter of the Tracking of | ) | |
|---|---|---|
| *(Identify the person to be tracked or describe* | ) | |
| *the object or property to be used for tracking)* | ) | |
| | ) | Case No. |
| THE TAN 2013 NISSAN ALTIMA BEARING OHIO | ) | |
| LICENSE PLATE NUMBER JTZ6052, VIN | ) | |
| 1N4AL3AP1DC289456 | ) | |

3:22 mj  322

MICHAEL J. NEWMAN

## APPLICATION FOR A TRACKING WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or attorney for the government, have reason to believe that the person, property, or object described above has been and likely will continue to be involved in one or more violations of

21 U.S.C. § 841(a)(1) & 846 . Therefore, in furtherance of a criminal investigation, I request authority to install and use a tracking device or use the tracking capabilities of the property or object described above to determine location. The application is based on the facts set forth on the attached sheet.

☑ The person, property, or object is located in this district.

☐ The person, property, or object is not now located in this district, but will be at the time of execution.

☐ The activity in this district relates to domestic or international terrorism.

☐ Other:

The tracking will likely reveal these bases for the warrant under Fed. R. Crim. P. 41(c): *(check one or more)*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

☑ I further request, for purposes of installing, maintaining or removing the tracking device, authority to enter the following vehicle or private property, or both:

TAN 2013 NISSAN ALTIMA BEARING OHIO LICENSE PLATE NUMBER JTZ6052, VIN 1N4AL3AP1DC289456

☑ Delayed notice of  30  days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

SA Eric J. McIntosh, FBI
*Applicant's printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by _____ *(specify reliable electronic means)*

Date:  9/30/22

_____
*Judge's signature*

City and state:  DAYTON, OHIO

Hon. Michael J. Newman, U.S. District Court Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

IN THE MATTER OF THE TRACKING OF
THE TAN 2013 NISSAN ALTIMA
BEARING OHIO LICENSE PLATE
NUMBER JTZ6052, VIN
1N4AL3AP1DC289456

Case No. _____

**Filed Under Seal**

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Eric J. McIntosh, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant under

Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 3117 to authorize the installation and

monitoring of a tracking device in/on a tan 2013 Nissan Altima bearing Ohio license plate number

JTZ6052, vehicle identification number 1N4AL3AP1DC289456 ("the **SUBJECT VEHICLE**").

Based on the facts set forth in this affidavit, I believe that the **SUBJECT VEHICLE** is presently

being used in furtherance of drug trafficking crimes such as possession with intent to distribute

controlled substances, distribution of controlled substances, and conspiracy to distribute controlled

substances, in violation of Title 21, U.S.C., §§ 841(a)(1) and 846, and that there is probable cause

to believe that the installation of a tracking device in/on the **SUBJECT VEHICLE** and use of the

tracking device will lead to evidence, fruits, and instrumentalities of the aforementioned crimes as

well as to the identification of individuals who are engaged in the commission of those and related

crimes.

2.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have

been since August of 2003. My primary duties as a Special Agent consist of investigating criminal

enterprises, narcotics investigations, organized crime, and violent crimes to include unlawful possession and possession with the intent to distribute controlled substances, as well as the associated conspiracies in violation of Title 21, United States Code, Sections 841, 843, and 846. I am familiar with federal firearms laws, and investigations into possession of a firearm by a convicted felon, possessing a firearm in furtherance of a drug trafficking crime and the associated violations of Title 18, United States Code, Sections 922 and 924. As part of my standard training to become a FBI Special Agent, I have received specialized training in the means and methods by which individuals and criminal enterprises conduct their illegal activities, as well as in the use of various investigative techniques used to uncover unlawful activities. Based upon my experience and training, I am familiar with the ways in which drug traffickers conduct their unlawful drug trafficking activity, including, but not limited to, their use of code words and numbers to conduct their transactions, their use of multiple telephones to conduct their illegal activities, their methods for concealing narcotics and narcotics proceeds and their use of firearms, violence, and threats of violence to protect their criminal organization. I have received further specialized training concerning the interception of wire communications.

3. I have participated in various types of electronic surveillance, including the interception of wire communications, in investigations of drug traffickers, money launderers, and violent criminal enterprises. I am also familiar with, and have personally participated in, other normal methods of investigating criminal enterprises, including, but not limited to, visual surveillance, the questioning of witnesses, the use of informants, undercover operations, the use of pen registers, including pen registers in the form of digital analyzers, and the use of vehicle tracking devices to identify drug traffickers and reveal their methods of operation.

2

4.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

5.      The United States, including the FBI, is conducting a criminal investigation of Dlaquan CANTRELL ("CANTRELL") and other co-conspirators, both known and unknown, regarding possible violations of possession with intent to distribute controlled substances, distribution of controlled substances, and conspiracy to distribute controlled substances, in violation of Title 21, U.S.C., §§ 841(a)(1) and 846 (collectively referred to as the "Subject Offenses"). Specifically, the FBI Cincinnati and the Warren County Drug Task Force ("WCDTF") are investigating a Dayton area, poly-drug distribution network led by CANTRELL.

**A. Law enforcement learned that CANTRELL traffics drugs in the Dayton, OH area.**

6.      From August 2022 to the present, agents and officers obtained information from a Confidential Informant ("CI")[1] with direct knowledge of CANTRELL's drug trafficking organization. The CI positively identified CANTRELL as a Dayton-based methamphetamine and heroin/fentanyl supplier.

7.      The CI told law enforcement that CANTRELL is currently selling drugs in and around the Dayton, OH area.

_____

[1] The Confidential Informant has provided information to officers that has proven to be reliable and truthful. The CI is cooperating with law enforcement due to a pending criminal investigation into possible violations of state of Ohio drug laws. Although no promises have been made to the CI, the CI is motivated to cooperate with law enforcement in hopes of consideration during the prosecution of his/her criminal case. The CI has never provided materially false information.

**B. The evidence suggests that CANTRELL currently uses the SUBJECT VEHICLE to further his drug trafficking business.**

    **i.    CANTRELL used the SUBJECT VEHICLE to meet the UC during a controlled purchase on September 8, 2022.**

    8.    On September 8, 2022, a law enforcement officer, acting in an undercover capacity (hereinafter, "UC") purchased six ounces of methamphetamine and a half ounce of heroin from CANTRELL for $1,700 in the parking lot of Kohl's department store, located at 10800 Innovation Drive, Miamisburg, Ohio. The UC arranged the drug transaction by contacting CANTRELL at cellular telephone number (937) 672-0827[2] in recorded text messages. An excerpt from their text message exchange is below:

| | |
|---|---|
| UC | You on with that fire and ice |
| CANTRELL | I got it brother. |
| UC | Ticket on zip of [emoji of fire]? |
| CANTRELL | To you 200. |
| UC | Girl? |
| CANTRELL | My bad brother. |
| CANTRELL | [Crying smiley face emoji] |
| CANTRELL | I got everything you need brother. |

    9.    In my training and experience, "fire" and/or an emoji of fire refers to heroin or fentanyl, and "ice" refers to methamphetamine. "Ticket" is a common slang term for price, and "zip" is a common street term for an ounce of narcotics. Two hundred dollars per ounce is a

---

[2] All of CANTRELL's communications with the UC, including text messages and Facetime video calls, were placed either to or from this number.

price consistent with methamphetamine, not heroin, which is much more expensive. The UC clarified what drug CANTRELL was quoting him by asking "Girl?", a common slang word for heroin. CANTRELL replied, "My bad brother," because CANTRELL had provided the UC a price per ounce of methamphetamine, not a price for heroin ("girl").

10. After the text exchange described above, CANTRELL placed a Facetime video call[3] to the UC which was audio recorded. During the video call, CANTRELL opened a shoebox and showed the UC a large amount of methamphetamine, heroin, and U.S. currency. CANTRELL told the UC they were "like family now." CANTRELL proceeded to walk around his house showing the UC the inside of his home, to include his girlfriend sleeping in a bed in a bedroom. The UC and CANTRELL then discussed the UC purchasing from CANTRELL six ounces of methamphetamine for $1,000.00 and a half ounce of heroin for $700.00 at the Kohl's parking lot located at 10800 Innovation Drive, Miamisburg, Ohio.

11. On September 8, 2022, at approximately 12:08 p.m., CANTRELL placed a Facetime video call to the UC and asked the UC what the UC was driving. The UC and surveillance agents then observed an unknown black male walking in the parking lot directly towards the UC's vehicle. Surveillance agents also observed CANTRELL, who arrived in the **SUBJECT VEHICLE**, outside of the Kohl's department store in a separate area from the unknown black male. Observing the unknown male approaching the UC's vehicle, the UC moved to another area of the parking lot. The UC noted during the Facetime video call that CANTRELL asked the UC why the UC was moving despite CANTRELL not being in a position to see the UC.

---

[3] The UC compared the person on the Facetime video call with the Ohio driver's license photograph of CANTRELL and determined them to be one and the same.

In my training and experience, drug traffickers use associates to conduct countersurveillance of drug deals to detect a law enforcement presence. The unknown black male walking towards the UC's vehicle and CANTRELL knowing the UC was moving his vehicle while remaining out of sight is consistent with CANTRELL using an associate to conduct countersurveillance prior to the drug transaction.

12.     At approximately 12:10 p.m., while on another Facetime video call with the UC, CANTRELL walked out of Kohl's and got in the UC's vehicle.[4]  CANTRELL pulled methamphetamine (total package weight of 169.9 grams) and heroin (total package weight of 15.3 grams) from his pant pocket and placed the drugs in a Taco Bell bag the UC had in the vehicle. The UC pulled the methamphetamine and heroin out of the Taco Bell bag and asked CANTRELL if the weight was going to be right. CANTRELL advised it would be right and the UC handed CANTRELL $1,700 in pre-recorded buy money. CANTRELL then exited the UC's vehicle and walked back inside Kohl's. After a short period of time, surveillance agents saw CANTRELL and a woman, D.S.,[5] walk out of Kohl's and get into the **SUBJECT VEHICLE**. Agents noted CANTRELL was carrying a baby carrier. CANTRELL drove the **SUBJECT VEHICLE** away.

**ii.     CANTRELL used the SUBJECT VEHICLE to meet the UC during a controlled purchase on September 22, 2022.**

13.     On September 22, 2022, the UC purchased three and a quarter ounces of methamphetamine and an ounce of heroin from CANTRELL for $1,900 in the parking lot of

---

[4] Agents obtained Kohl's security video which shows CANTRELL walking in and out of the department store.

[5] D.S. is the registered owner of the SUBJECT VEHICLE. Surveillance agents compared the woman observed during the September 8, 2022, surveillance with the Ohio driver's license photograph of D.S. and determined them to be one and the same. Because D.S. is not currently the target of a criminal investigation, I am using her initials to protect her privacy.

Applebee's, located at 105 North Springboro Pike, Dayton, Ohio. The UC arranged the drug transaction by contacting CANTRELL in recorded text messages. The UC asked CANTRELL, "You on," and CANTRELL responded, "Yes was checking on you." CANTRELL then placed a Facetime video call[6] to the UC. During the video call, the UC and CANTRELL arranged the purchase of one ounce of fentanyl for $1,400.00 and four ounces of methamphetamine for $600 for a total purchase price of $2,000.00. CANTRELL told the UC to meet him at a restaurant near the Dayton Mall at 5:30 P.M.

14.     On September 22, 2022, at approximately 5:15 p.m., agents and officers established surveillance near the Dayton Mall. As the UC was driving to the area, CANTRELL placed several Facetime video calls to the UC repeatedly asking where the UC was at. In my training and experience, drug dealers will place repeated calls to an individual they are selling drugs to in an effort to detect if law enforcement surveillance is involved. The repeated calls make it difficult for a UC or a CI to coordinate with law enforcement officers conducting surveillance of the drug transaction. During one of the Facetime video calls, CANTRELL directed the UC to the Applebee's restaurant, located at 105 North Springboro Pike, Dayton, Ohio.

15.     Surveillance agents observed CANTRELL (driver) and an unidentified female (passenger) in the **SUBJECT VEHICLE**, which was parked in the Applebee's parking lot. The UC parked the UC's vehicle next to the **SUBJECT VEHICLE**. CANTRELL got out of the **SUBJECT VEHICLE** and into the UC's vehicle. CANTRELL pulled out a sock and laid it on the center console of the UC's vehicle. The UC pulled plastic baggies containing

---

[6] The Facetime video call was not recorded by the UC because a recording device was not available at the time.

methamphetamine (total package weight of 91.2 grams) and heroin[7] (total package weight of 29.0 grams) out of the sock, examined it, placed the drugs back in the sock and placed the sock in a cup in the UC vehicle. CANTRELL told the UC the methamphetamine would be "a little light" so the UC could take $100 off the agreed-upon purchase price of $2,000. The UC handed CANTRELL $1,900.00 in pre-recorded buy money. CANTRELL then exited the UC's vehicle and got back into the driver's seat of the **SUBJECT VEHICLE**. Agents and officers then surveilled CANTRELL and the unidentified female as they traveled to the Dayton Mall, parked, and entered the mall.

16.    Shortly after the transaction on September 22, 2022, CANTRELL placed a Facetime video call to the UC. CANTRELL told the UC do drive carefully. The UC then asked CANTRELL if the UC could "step on this," referring to cutting the heroin. CANTRELL told the UC the UC could "hit it one time again," meaning the UC could add cutting agent to the heroin. CANTRELL explained the heroin was very strong. CANTRELL advised the UC to have a drug user with a high tolerance test the heroin to tell the UC how strong the heroin really is.

### C. I believe that tracking the SUBJECT VEHICLE's location will provide evidence relevant to my investigation into CANTRELL's drug trafficking crimes.

17.    Based on the facts set forth in this affidavit, there is probable cause to believe that CANTRELL uses the **SUBJECT VEHICLE** to facilitate his drug trafficking activities in violation of Title 21 of the United States Code. I believe that the information sought by this warrant will help the investigative team monitor the location of the **SUBJECT VEHICLE**, thus CANTRELL, and determine the location and transportation method of drug shipments as part of

---

[7] The heroin supplied by CANTRELL was dyed purple in color.

the investigation into the Subject Offenses conducted by CANTRELL and co-conspirators. By monitoring the location of the **SUBJECT VEHICLE**, agents and officers will be able to identify the primary residence used by CANTRELL and locations, such as possible stash-houses, used by the drug trafficking organization.

18.	Based on the observations of law enforcement, I know that the **SUBJECT VEHICLE** is presently within the Southern District of Ohio.

19.	In order to track the movement of the SUBJECT VEHICLE effectively and to decrease the chance of detection, I seek authorization to place a tracking device in/on the **SUBJECT VEHICLE** while it is in the Southern District of Ohio. Because CANTRELL may sometimes park the **SUBJECT VEHICLE** in driveways and on other private property, it may be necessary to enter onto private property and/or move the **SUBJECT VEHICLE** to effect the installation, repair, replacement, and removal of the tracking device.

20.	To ensure the safety of the executing officer(s) and to avoid premature disclosure of the investigation, it is requested that the court authorize installation, maintenance, and removal of the tracking device during both daytime and nighttime hours. I know, based on my training and experience, that agents are more likely to be detected if they place a tracking device on a vehicle during the daytime hours. I also know that CANTRELL has committed violent offenses in the past, which increases the need to ensure officer safety.

21.	In the event the Court grants this application, there will be periodic monitoring of the tracking device during both daytime and nighttime hours for a period not to exceed 45 days following issuance of the warrant. The tracking device may produce signals from inside private garages or other such locations not open to the public or visual surveillance.

9

## AUTHORIZATION REQUEST

22.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 3117, that authorizes members of the FBI or their authorized representatives, including but not limited to other law enforcement agents and technicians assisting in the above-described investigation, to install a tracking device in/on the **SUBJECT VEHICLE** within the Southern District of Ohio within 10 days of the issuance of the proposed warrant, to maintain, repair, and/or replace the tracking device as necessary, and to remove the tracking device from the **SUBJECT VEHICLE** after the use of the tracking device has ended; to install, maintain, and remove the tracking device during both daytime and nighttime hours; and to monitor the tracking device for a period of 45 days following the issuance of the warrant, including when the tracking device is inside private garages and other locations not open to the public or visual surveillance, both within and outside the Southern District of Ohio.

23.     In accordance with 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), I further request that the warrant delay notification of the execution of the warrant for 30 days after the end of the authorized period of tracking (including any extensions thereof) because there is reasonable cause to believe that providing immediate notification may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice would seriously jeopardize the ongoing investigation by prematurely revealing its existence and giving suspects an opportunity to flee from prosecution, destroy or tamper with evidence, intimidate potential witnesses, notify confederates, and change patterns of behavior.

24.     I further request that the Court seal the warrant and the affidavit and application in support thereof, except that copies of the warrant in full or redacted form may be maintained by

the United States Attorney's Office and may be served on Special Agents and other investigative and law enforcement officers of the FBI, federally deputized state and local law enforcement officers, and other government and contract personnel acting under the supervision of such investigative or law enforcement officers, as necessary to effectuate the warrant. These documents pertain to and discuss an ongoing criminal investigation that is neither public nor known to all the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize the investigation. Sealing these documents will also better ensure the safety of agents and others.

Respectfully submitted,

Eric J. McIntosh
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on September 30, 2022:

MICHAEL J. NEWMAN
UNITED STATES DISTRICT COURT JUDGE

11